1   STEPHANIE M. HINDS (CABN 154284)
    Acting United States Attorney

2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   KYLE F. WALDINGER (CABN 298752)
    Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-6830
7       Facsimile: (415) 436-7234
        Email: Kyle.Waldinger@usdoj.gov
8
    Attorneys for the United States of America
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,          )  CASE NO. CR 14-0196 CRB
                                        )
14          Plaintiff,                  )  UNITED STATES' OPPOSITION TO
                                        )  DEFENDANT KEITH JACKSON'S MOTION FOR
15       v.                             )  RECONSIDERATION RE: COURT'S ORDER
                                        )  DENYING MOTION TO REDUCE SENTENCE
16  KEITH JACKSON,                      )  PURSUANT TO 18 U.S.C. 3582(c)(1)(A)(i)
                                        )
17          Defendant.                  )
                                        )
18  _____ )

19

20

21

22

23

24

25

26

27

28

USA'S OPP. TO MTN. FOR RECONSIDERATION RE: ORDER
DENYING MTN. FOR SENT. REDUCTION [CR 14-0196 CRB]

## <u>TABLE OF CONTENTS</u>

BACKGROUND………………………………………………………………………………….1

ARGUMENT………………………………………………………………………………….....5

I.   DEFENDANT HAS NOT SATISFIED THE 30-DAY STATUTORY PREREQUISITE FOR CONSIDERATION OF HIS MOTION AND THIS COURT MUST ENFORCE THIS CLAIMS-PROCESSING RULE ONCE INVOKED……………………………………………………………………….. 5

    A.   Failure to exhaust mandates dismissal …………………………………………………5

    B.   Defendant has not exhausted his administrative remedies ………………………………7

II.   REDUCTION OF DEFENDANT'S SENTENCE IS NOT WARRANTED ……………………7

    A.   Applicable law……………………………………………………………………….... 8

    B.   Defendant has not presented extraordinary and compelling reasons warranting his release ………………………………………………………………………………...11

        1.   The family circumstances cited by Defendant do not constitute an extraordinary and compelling reason ………………………………………………………..11

        2.   Any COVID-19 threats to Defendant's health do not constitute an extraordinary and compelling reason ………………………………………………………..13

        3.   Defendant's alleged rehabilitation in prison and other Section 3553(a) factors do not constitute an extraordinary and compelling reason …………………………17

    C.   This Court should not modify Defendant's sentence because he presents a risk of harm to the public ……………………………………………………………………..20

CONCLUSION ……………………………………………………………………………21

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

### <u>Cases</u>

4

*Barron v. Ashcroft*,

5     358 F.3d 674 (9th Cir. 2004) ..................................................................................... 7

*Bonneau v. Salazar*,

6     804 F. App'x 717 (9th Cir. 2020) ............................................................................. 23

*United States v. Cazares*,

7     445 F. Supp. 3d 425 (N.D. Cal. Apr. 23, 2020)........................................................ 27

*Eberhart v. United States*,

8     546 U.S. 12 (2005)...................................................................................................... 7

*Fort Bend County, Texas v. Davis*,

9     139 S. Ct. 1843 (2019)................................................................................................ 7

*Gonzalez v. Thaler*,

10    565 U.S. 134 (2012)..................................................................................................... 8

*McCarthy v. Madigan*,

11    503 U.S. 140 (1992)..................................................................................................... 8

12    *Reeb v. Thomas*,

      636 F.3d 1224 (9th Cir. 2011) .................................................................................. 23

13
*Ross v. Blake*,

14    136 S. Ct. 1850 (2016)............................................................................................ 8, 10

*Shaw v. Bank of America Corp.*,

15    946 F.3d 533 (9th Cir. 2019) ...................................................................................... 9

16    *Tapia v. United States*,

      564 U.S. 319 (2011)............................................................................................. 23, 24

17    *United States v. Alam*,

      960 F.3d 831 (6th Cir. 2020) ................................................................................... 8, 9

18    *United States v. Aruda*,

      --- F.3d ---, 2021 WL 1307884 (9th Cir. Apr. 8, 2021).......................................... 1, 13

19    *United States v. Ayon-Nunez*,

20    2020 WL 704785 (E.D. Cal. Feb. 12, 2020)............................................................ 17

*United States v. Baye*,

21    464 F. Supp. 3d 1178 (D. Nev. 2020) ...................................................................... 19

*United States v. Beltran*,

22    2021 WL 398491 (S.D. Tex. Feb. 1, 2021) ............................................................. 21

23    *United States v. Bucci*,

      409 F. Supp. 3d 1 (D. Mass. 2019) .......................................................................... 19

24    *United States v. Burrill*,

      445 F. Supp. 3d 22 (N.D. Cal. 2020) ....................................................................... 13

25    *United States v. Ceballos*,

      671 F.3d 852 (9th Cir. 2011) .................................................................................... 23

26    *United States v. Daychild*,

      357 F.3d 1082 (9th Cir. 2004) .................................................................................. 27

27
*United States v. Eberhart*,

28    448 F. Supp. 3d 1086 (N.D. Cal. 2020) .................................................................... 16

*United States v. Fuentes,*
  834 F. App'x 414 (9th Cir. 2021) ............................................................. 8

*United States v. Goldberg,*
  2020 WL 1853298 (D.D.C. Apr. 13, 2020) .......................................... 19

*United States v. Greenhut,*
  2020 WL 509385 (C.D. Cal. Jan. 31, 2020) ........................................ 15

*United States v. Gunn,*
  980 F.3d 1178 (7th Cir. 2020) ............................................................... 14

*United States v. Holden,*
  2020 WL 1673440 (D. Or. Apr. 6, 2020) ............................................. 10

*United States v. Ingram,*
  2019 WL 3162305 (S.D. Ohio July 16, 2019) ..................................... 19

*United States v. Mangarella,*
  2020 WL 1291835 (W.D.N.C. Mar. 16, 2020) ................................... 17

*United States v. McGee,*
  --- F.3d ---, 2021 WL 1168980 (10th Cir. Mar. 29, 2021) ................ 14

*United States v. Raia,*
  954 F.3d 594 (3d Cir. 2020) ................................................................... 16

*United States v. Smith,*
  2021 WL 364636 (E.D. Mich. Feb. 3, 2021) ...................................... 21

*United States v. Sprague,*
  135 F.3d 1301 (9th Cir. 1998) ............................................................... 15

*United States v. Torres,*
  911 F.3d 1253 (9th Cir. 2019) ............................................................... 28

*United States v. Weidenhamer,*
  2019 WL 6050264 (D. Ariz. Nov. 8, 2019) ........................................ 17

*Weinberger v. Salfi,*
  422 U.S. 749 (1975) ................................................................................... 9

## Statutes

18 U.S.C. § 1962(d) .......................................................................................... 2
18 U.S.C. § 3553(a) ................................................................................... 24, 27
18 U.S.C. § 3582 ............................................................................................... 2
18 U.S.C. § 3582(c)(1)[(A)] ................................................................... passim
18 U.S.C. § 3621(b) ........................................................................................ 23
18 U.S.C. § 3624(c) ........................................................................................ 23
28 U.S.C. § 994(t) .............................................................................. 14, 24, 27

## Rules

U.S.S.G. § 1B1.13 .................................................................................. passim

## Regulations

28 C.F.R. § 542.15(a) ....................................................................................... 7
28 C.F.R. § 571.61 ............................................................................................ 7

1    Defendant Keith Jackson is currently serving a 108-month sentence for his RICO conspiracy

2  conviction.  Jackson is incarcerated at FCI-Lompoc, with an anticipated release date of November 14,

3  2023.  He seeks reconsideration of this Court's October 2, 2020, order denying his motion for a

4  reduction of his sentence, brought pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  *See* dkt. 2266 (motion for

5  reconsideration); *see also* dkt. 2244 (motion for reduction of sentence).  Although Defendant is correct

6  that this Court is permitted to consider factors such as the catch-all prong of note 1(D) of U.S.S.G.

7  § 1B1.13 in ruling on a motion under Section 3582(c)(1)(A), *see United States v. Aruda*, --- F.3d ---,

8  No. 20-10245, 2021 WL 1307884, at *2–4 (9th Cir. Apr. 8, 2021) (holding that current version of

9  Section 1B1.13 "is not an 'applicable policy statement[ ] issued by the Sentencing Commission' for

10  motions filed by a defendant under the recently amended § 3582(c)(1)(A)"), the fact remains that there

11  are simply no "extraordinary and compelling reasons" warranting a reduction of Defendant's sentence.

12  In other words, although the Ninth Circuit's recent *Aruda* decision expands the scope of the factors that

13  this Court may consider in determining whether a sentence reduction is appropriate under Section

14  3582(c)(1)(A), upon reconsideration of its prior ruling the Court should still deny Defendant's initial

15  motion for a sentence reduction because (1) the family circumstances described in his motion are not

16  recognized in Section 1B1.13's family circumstances prong and, in any event, Defendant's wife is

17  available to provide care for Defendant's mother; (2) Defendant's own circumstances in light of the

18  COVID-19 pandemic do not warrant compassionate release; and (3) the facts of Defendant's case and

19  his crimes, in light of the Section 3553(a) factors, do not warrant a sentence reduction.

20    These points are set out in more detail below.

21                              **BACKGROUND**

22    Defendant was charged with a violation of 18 U.S.C. § 1962(d), which prohibits conspiring to

23  conduct the affairs of an enterprise through a pattern of racketeering activity.  *See* dkt. 671 (Second

24  Superseding Indictment) (Count Two).

25    On July 1, 2015, Defendant pled guilty pursuant to a plea agreement with the government.  In the

26  plea agreement, Defendant waived his right to move for relief under 18 U.S.C. § 3582.  *See* dkt. 853,

27  ¶ 5, at 6.  Defendant's conviction was based on his membership and association with campaigns formed

28  to finance and support the election of Leland Yee for the positions of mayor of San Francisco and

California Secretary of State in 2011 and 2014, respectively.  Although Defendant participated in legal fundraising and legal campaign activities, he admitted that he also agreed with Yee to conduct and participate in the conduct of campaign affairs through a pattern of racketeering activity.  Dkt. 853, ¶ 2, at 3:10-15 (Plea Agreement).  In his written plea agreement with the government, Defendant admitted that he engaged in at least two acts of racketeering and in the following overt acts:

- Agreeing in an interstate telephone call on or about September 26, 2012, that Yee would provide a letter and telephone call to an undercover FBI employee (UCE 4773) for the benefit of UCE 4773's purported client, in exchange for $10,000 to retire Yee's debt from the mayoral campaign, which act constituted honest services wire fraud;

- Accepting the aforementioned $10,000 (in cash) on or about November 19, 2012, in exchange for an interstate telephone call made by Yee and a letter written by Yee (both of which were done in Yee's capacity as a State Senator), all for the benefit of the business interests of UCE 4773's purported client, which act constituted honest services wire fraud;

- Agreeing with Yee on or about March 2, 2013, to a conspiracy and plan to extort and obtain money and campaign donations from an individual who had an interest in pending legislation, all by leading that individual to believe that Yee would vote against the legislation unless campaign support was forthcoming from that individual and from others who had an interest in the legislation, which act constituted conspiracy to obtain property under color of official right under the Hobbs Act;

- Accepting a $5,000 check on or about May 6, 2013, made payable to Yee's campaign from another FBI undercover employee (UCE 4599), knowing that the check was in exchange for Yee providing a certificate on California State Senate letterhead honoring the Chee Kung Tong, which act constituted honest services wire fraud conspiracy;

- Receiving an $11,000 cash bribe on or about June 22, 2013, from another FBI undercover employee (UCE 4180), knowing that it was in exchange for a meeting arranged by Yee, in his capacity as State Senator, with another State Senator so that UCE 4180 could discuss his purported interest in marijuana legislation, which act constituted honest services wire fraud conspiracy;

- Having a discussion with UCE 4180 on or about June 22, 2013, during which Defendant told UCE 4180 that Yee would accept $60,000 in exchange for Yee's vote on pending legislation for workers' compensation for professional athletes, which act constituted conspiracy to obtain property under color of official right in violation of the Hobbs Act;

- Meeting with Yee, UCE 4599, and another individual on or about March 11, 2014, and discussing UCE 4599's desire to purchase weapons from the Philippines and transport them to the Port of Newark, New Jersey, which act constituted conspiracy to knowingly import and bring into the United States any firearm or ammunition in violation of U.S. law; and

- Reimbursing an individual with $3,000 in cash on or about March 17, 2014, in exchange for two checks made payable to Yee's campaign, all while knowing that the cash was money paid by UCE 4599 in furtherance of a weapons trafficking deal, which act constituted money laundering.

Dkt. 853, ¶ 2, at 3-5 (Plea Agreement).

On February 24, 2016, this Court sentenced Defendant to 108 months' imprisonment, to be followed by a three-year term of supervised release. The Court recommended that Defendant participate in the BOP's Residential Drug Abuse Program ("RDAP")[1] and that the BOP place him in a facility close to the San Francisco Bay Area. The Court ordered Defendant to self-surrender on March 25, 2016. *See* dkt. 1346 (Judgment). Defendant is presently serving his sentence at FCI-Lompoc, with a projected release date of November 14, 2023. *See* https://www.bop.gov/inmateloc/.

Defendant is 56 years old. The U.S. Probation Office's Presentence Investigation Report noted that Defendant had never been treated, hospitalized, or diagnosed with a physical or mental health condition, but did identify a substance abuse problem (alcohol). PSR, ¶¶ 151-54. However, according to materials provided to counsel for the government by the BOP, Defendant now suffers from at least one health condition that is relevant to COVID-19. *See* Ex. 1, at 15 (under seal). According to guidelines published on-line by the CDC, having such a disease can make a person more likely to get severely ill from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

---

[1] Based on records provided to counsel for the government by the BOP, it appears that Defendant did not participate in the RDAP.

1   precautions/people-with-medical-conditions.html (last updated Mar. 29, 2021).  The government notes,

2   however, that Defendant has not raised this specific health condition in his moving papers.

3        Defendant claims that he "submitted a request to reduce the term of imprisonment to the Warden

4   of FCI Lompoc" on July 21, 2020, and that more than 30 days have passed without the Warden acting

5   on his request.  Dkt. 2244, at p. 7 of 9.  However, government counsel has been informed by counsel for

6   the BOP that the records custodian at FCI-Lompoc has not found any record of such a request.

7        Defendant initially filed a pleading styled as a Motion to Reduce Sentence Pursuant to 18 U.S.C.

8   3582(c)(1)(A)(i) on September 25, 2020.  Dkt. 2244.  Defendant's motion was based on "extraordinary

9   and compelling reasons" arising from his family circumstances, as well as on an "extraordinary and

10  compelling reason other than, or in combination with the other categories" identified in note 1 to

11  U.S.S.G. § 1B1.13 (*i.e.*, the catch-all prong).  *See, e.g.*, dkt. 2244, at pp. 4 & 5 of 9.

12       This Court issued its Order Denying Motion for Compassionate Release on October 2, 2020.

13  Dkt. 2247.  The Court found that the "family circumstances" prong in note 1 to Section 1B1.13 did not

14  apply to Defendant's circumstances because, although Defendant asserted that he needed to be released

15  to care for his mother, "care for an ailing parent is not one of the family circumstances recognized by the

16  Sentencing Commission."  Dkt. 2247, at 3:15-17.  The Court also found that it was unable to rely on the

17  catch-all prong of Section 1B1.13's note because that prong required that the Director of the BOP make

18  the determination that an extraordinary or compelling reason existed.  Dkt. 2247, at 3:4-7.

19       On April 9, 2021, Defendant filed a pleading styled as a Motion for Reconsideration Pursuant to

20  18:3582(c)(1)(A)(i).  Dkt. 2266.  In that motion for reconsideration, Defendant did not explicitly

21  challenge the Court's ruling that the "family circumstances" identified in his motion did not constitute

22  an extraordinary or compelling reason.  Rather, Defendant's motion for reconsideration can fairly be

23  read to seek the Court's reconsideration of its prior ruling that it was unable to consider Section

24  1B1.13's catch-all provision in determining whether an extraordinary and compelling reason existed,

25  either alone or in combination with other factors, that warranted his release from custody.

26       Although Defendant's motion for reconsideration does not raise the issue of COVID-19, his

27  original motion to reduce sentence raised the specter of that disease by stating, "Also, the way that the

28  pandemic is spreading here in this prison [environ]ment, [Defendant] is in dire need to be released

before he is infected with [] COVID-19." Dkt. 2244, at p. 6 of 9.  Accordingly, the government notes here that Defendant received the Pfizer-BioNTech vaccine on December 30, 2020, and January 21, 2021.  Ex. 1, at 17.  In his moving papers, Defendant does not allege that he has contracted the COVID-19 virus while incarcerated, and the government does not believe that he has.  *See id.* at 29-39.

## ARGUMENT

## I.   DEFENDANT HAS NOT SATISFIED THE 30-DAY STATUTORY PREREQUISITE FOR CONSIDERATION OF HIS MOTION AND THIS COURT MUST ENFORCE THIS CLAIMS-PROCESSING RULE ONCE INVOKED

Defendant claims that he submitted a request in July 2020 to the Warden of FCI Lompoc to reduce his prison term, but counsel for the government has been informed by BOP counsel that the records custodian at FCI-Lompoc has not found any record of such a request.  Waldinger Decl., ¶ 4.  Under 18 U.S.C. § 3582(c)(1)(A), this Court therefore cannot modify his sentence.  This statutory imperative is a mandatory claim-processing rule that entitles the party invoking it to relief.

### A.   Failure to exhaust mandates dismissal

Title 18, United States Code, Section 3582(c)(1)(A), as amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194, provides in pertinent part that a court "may not modify a term of imprisonment once it has been imposed except" upon a defendant's motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier," where such a reduction also meets other requirements.

To exhaust administrative remedies, an inmate must initiate a written request to the Warden detailing "the extraordinary or compelling circumstances that the inmate believes warrant consideration" and the inmate's "proposed release plans" with several necessary details.  28 C.F.R. § 571.61 (implementing Section 3582(c)(1)(A)).  BOP's Program Statement sets forth implementation procedures for Section 3582, stating, "A request for a RIS [reduction in sentence] is considered 'submitted' for the purposes of 18 U.S.C. §3582(c)(1), when received by the Warden in accordance with this section."  *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  Then, the inmate must either wait 30 days to appeal to a court, or exhaust two additional BOP levels of appeal under 28 C.F.R. § 542.15(a).

If a defendant fails to meet the statute's administrative exhaustion requirements, the statute's

plain language bars relief:  it prohibits a court from modifying a sentence "except" when the requirements are met.  This language represents a mandatory claim-processing rule that "a court must enforce [ ] if a party properly raises it."  *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) (stating that claim-processing rules are those that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times" and quoting *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam) (internal quotation and alterations omitted)).  "'Where Congress specifically mandates' it, exhaustion is not merely appropriate but 'required.'"  *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)).  The government raises the rule here, and it must be enforced.  *See United States v. Alam*, 960 F.3d 831, 833–36 (6th Cir. 2020) (holding that § 3582(c)(1)(A)'s exhaustion requirement was mandatory claim-processing rule that must be enforced if government raised it).[2]

"A court may not excuse a defendant's failure to comply with a statutory exhaustion requirement."  *United States v. Fuentes*, 834 F. App'x 414, 415 (9th Cir. 2021) (citing *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016)).  Because Congress – and not the courts – imposed the exhaustion requirement in § 3582(c)(1), the Court is without authority to waive it, notwithstanding COVID-19 and the current health crisis.  While *judicially*-created exhaustion requirements may sometimes be excused by judge-created exceptions, it is well settled that a court may not ignore a *statutory* command such as that presented in Section 3582(c)(1)(A).  *Shaw v. Bank of America Corp.*, 946 F.3d 533, 541 (9th Cir. 2019) ("[T]the Supreme Court has made clear that if exhaustion 'is a statutorily specified prerequisite' – as opposed to a judicially created one – '[t]he requirement is . . . something more than simply a codification of the judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial conclusion of futility[.]'" (quoting *Weinberger v. Salfi*, 422 U.S. 749, 755 (1975)).  The Sixth Circuit recently analyzed this very claim in the context of the COVID-19 pandemic and rejected it

---

[2]  The government previously took the position that the text of § 3582(c)(1)(A) created a "jurisdictional" bar to relief when a defendant failed to meet its procedural requirements.  Describing that same bar as a claim-processing rule instead of jurisdictional in nature, however, does not materially affect the required result – mandatory dismissal.  *See Gonzalez v. Thaler*, 565 U.S. 134, 146 (2012) ("[C]alling a rule nonjurisdictional does not mean that it is not mandatory or that a timely objection can be ignored. . . .  This Court . . . has long rejected the notion that all mandatory prescriptions, however emphatic, are properly typed jurisdictional." (internal quotation marks and ellipsis omitted)).

because "judge-made exceptions to judge-made exhaustion doctrines . . . are birds of a different feather." *Alam*, 960 F.3d at 832.

The Supreme Court recently reaffirmed the principle that courts may not excuse a failure to exhaust absent clear direction from Congress: "No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions . . . But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Ross*, 136 S. Ct. at 1857. Thus, a statutory exhaustion scheme such as is included in Section 3582(c)(1) is a "mandatory exhaustion regime[ ], foreclosing judicial discretion" and requires dismissal where raised. *Id.*

### B.   Defendant has not exhausted his administrative remedies

Here, Defendant did not meet the administrative exhaustion requirements of Section 3582(c)(1)(A), in that the records custodian at FCI-Lompoc has found no record of the request to the Warden that he claims to have made in July 2020. Waldinger Decl., ¶ 4. Thus, Defendant has not shown that he has filed an administrative motion with the warden, and his motion should be dismissed for failure to exhaust under the mandatory claim-processing rule in Section 3582(c)(1)(A).

*However*, the Court may conclude that it is possible that Defendant's request was lost, or misfiled, and may find it unlikely that Defendant would concoct an easily disprovable claim to have submitted a letter to the Warden in July 2020. In addition, it is possible that the BOP considered Defendant's request as insufficient because if it did not specify a request for compassionate release as opposed to home confinement, or did not include a release plan. *See also United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *4–5 (D. Or. Apr. 6, 2020) (finding defendant's request to the warden for home confinement did not trigger the start of the 30-day window for exhaustion purposes under Section 3582(c)(1)(A)). For all of these reasons, the government sets out below the reasons why Defendant's motion should be denied on the merits, if this Court proceeds to the merits.

## II.   REDUCTION OF DEFENDANT'S SENTENCE IS NOT WARRANTED

Although the COVID-19 pandemic is an extraordinary event, Defendant has failed to show that its impact on his family or on him – or that other reasons or a combination of reasons – warrant his release from confinement pursuant to 18 U.S.C. § 3582(c)(1)(A). This is true for at least three reasons.

*First*, as the Court previously held, the family circumstance identified by Defendant (*i.e.*, the need to provide care for his mother) "is not one of the family circumstances recognized by the Sentencing Commission" in Section 1B1.13.  Dkt. 2247, at 3:16-17.  Though the Court may not be constrained by the Commission's definition of "family circumstances" based on the Ninth Circuit's decision in *Aruda*, the situation described by Defendant in his original motion does not constitute an extraordinary or compelling reason under any view.  That is, although Defendant's wife contracted COVID-19 a year ago, there is no evidence that she is *now* incapable of providing care for his mother.  Moreover, although Defendant says that his sister cannot care for their mother and that Defendant's wife is his mother's "sole caregiver," his moving papers do not specifically address the question of whether other individuals (whether they be family members or not) can provide such care.

*Second*, Defendant has received both doses of the Pfizer-BioNTech COVID-19 vaccine.  Ex. 1, at 17 (under seal).  Accordingly, he faces a drastically reduced threat of contracting COVID-19 while in custody and an equally reduced threat of contracting a serious case of COVID-19.

*Third*, in light of the severity of Defendant's criminal conduct, neither Defendant's alleged rehabilitation while in prison nor a concomitant re-balancing of the Section 3553(a) factors indicate that Defendant should be released immediately as he seeks.  Simply put, there is no "extraordinary or compelling reason" counseling for a reduction of the 108-month sentence that this Court imposed in February 2016 as punishment for Defendant's egregious criminal activities.

### A.    Applicable law

This Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court "finds that" either "extraordinary and compelling reasons warrant such a reduction," or the defendant is at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  *See, e.g.*, *United States v. Reid*, No. 17-CR-00175-CRB-1, 2020 WL 2128855, at *1–2 (N.D. Cal. May 5, 2020); *United States v. Robinson*, No. 18-CR-00597-RS, 2020 WL 1982872, at *2 (N.D. Cal. Apr. 27, 2020).  Section 1B1.13 of the Sentencing Guidelines sets forth a policy statement regarding "Reduction in Term of imprisonment Under 18 U.S.C. § 3582(c)(1)(A)."

1    The Ninth Circuit recently held, in line with every circuit to have considered the issue, that

2    U.S.S.G. § 1B1.13 is not an "applicable" policy statement within the meaning of Section 3582(c)(1)(A)

3    for motions filed by a defendant, rather than the Director of BOP.  *United States v. Aruda*, --- F.3d ---,

4    No. 20-10245, 2021 WL 1307884, at *2–4 (9th Cir. Apr. 8, 2021) (citing other circuit opinions as

5    persuasive).[3]  However, the court also held that, even though it is not binding, "U.S.S.G. § 1B1.13 may

6    inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant[.]"  *Id.* at *4.

7    Courts, including this Court, have concluded that – even if not binding – the policy statement

8    "establish[es] helpful objective guideposts for evaluating whether a defendant should be granted

9    compassionate release under § 3582(c)(1)(A)."  *United States v. Rekhi*, No. 19-CR-00180-CRB-1, 2021

10   WL 411376, at *3 (N.D. Cal. Feb. 4, 2021); *United States v. Burrill*, 445 F. Supp. 3d 22, 24–25 n.2

11   (N.D. Cal. 2020); *see also United States v. McGee*, --- F.3d ---, No. 20-5047, 2021 WL 1168980, at *8

12   (10th Cir. Mar. 29, 2021) ("[W]e conclude that Congress . . . intend[ed] for the Sentencing Commission

13   to . . . describe those characteristic or significant qualities or features that typically constitute

14   'extraordinary and compelling reasons,' and for those guideposts . . . to be considered by district

15   courts[.]"); *United States v. Gunn*, 980 F.3d 1178, 1179–81 (7th Cir. 2020) ("The substantive aspects of

16   the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working

17   definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an

18   appellate holding that judicial discretion has been abused.").  And regardless of the policy statement,

19   Congress has explicitly stated that "[r]ehabilitation of the defendant alone shall not be considered an

20   extraordinary and compelling reason."  28 U.S.C. § 994(t).

21   As a permissible source to "inform" this Court's discretion under *Aruda*, U.S.S.G. § 1B1.13

22   describes "extraordinary and compelling reasons" to include:  (1) medical conditions that diminish the

23   ability of the defendant to provide self-care in prison, (2) age-related deterioration, (3) family

24   circumstances, or (4) other extraordinary and compelling reasons that exist either separately or in

25   combination with the previously described categories as determined by the BOP Director.  U.S.S.G.

26   § 1B1.13, cmt. n.1.  The policy statement in Section 1B1.13 also advises that relief not be granted for a

27
28       [3]  The government hereby preserves its argument that the policy statement is binding and *Aruda* was wrongly decided.

1     defendant who poses "a danger to the safety of any other person or to the community." U.S.S.G.

2     § 1B1.13(2). As this Court has noted in another case, regardless of whether the policy statement is

3     binding, these categories "are sensible." *Rekhi*, 2021 WL 411376, at *2–3.

4           Defendant bears the burden to show special circumstances meeting the high bar set by Congress

5     for compassionate release to be granted. *See United States v. Shabudin*, No. 11-CR-00664-JSW-1, dkt.

6     571 (N.D. Cal. May 12, 2020); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31,

7     2020) (holding that defendant bears the burden of establishing entitlement to sentencing reduction and

8     citing *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998)). Even absent a binding policy

9     statement in the Guidelines, the statute requires that a defendant show "exceptional and compelling"

10    reasons for a sentence reduction – a separate textual point than the analysis under Section 3553(a),

11    indicating that Congress did not view every inmate who could successfully articulate the need for a

12    rebalanced Section 3553(a) analysis as meriting relief under the statute. Instead, a defendant must make

13    a separate showing of "exceptional and compelling" reasons meriting sentence modification.

14          The COVID-19 pandemic, which poses a general threat to every non-immune person, does not

15    by itself meet such a standard. Indeed, looking to the policy statement for guidance even if it is not

16    binding, it is clear that "[g]eneral concerns about possible exposure to COVID-19 do not meet the

17    criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing

18    Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13." *United States v.*

19    *Eberhart*, 448 F. Supp. 3d 1086, 1090 (N.D. Cal. 2020); *see also United States v. Raia*, 954 F.3d 594,

20    597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread

21    to a particular prison alone cannot independently justify compassionate release, especially considering

22    BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

23          Nor would a defendant's chronic but manageable underlying medical condition, alone, constitute

24    "extraordinary and compelling" circumstances. *See United States v. Arceo*, No. 09-CR-00616-EJD-1,

25    2020 WL 2614873, at *2 (N.D. Cal. May 22, 2020) ("[T]he mere fact that Defendant suffers from

26    chronic conditions is insufficient [for compassionate release]."). Indeed, before the outbreak of COVID-

27    19, district courts addressing Section 3582(c)(1)(A) claims routinely noted: "To be faithful to the

28    statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant

suffers from . . . chronic conditions that [he] is not expected to recover from.  Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release."  *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a defendant suffering from severe back injuries and epilepsy) (quoting *United States v. Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)).  Compassionate release is "rare" and "extraordinary" and courts routinely deny such claims.  *See Arceo*, 2020 WL 2614873, at *2 (noting compassionate release is rare); *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event." (citation omitted)).

But the combination of an inmate's chronic medical condition and the risk of contracting COVID-19 in a custodial setting may constitute an extraordinary and compelling reason to grant a Section 3582(c)(1)(A) motion, where COVID-19 and an inmate's medical condition would not individually suffice.  If an inmate has a chronic medical condition that has been identified by the CDC as elevating his risk of becoming seriously ill from COVID-19,[4] that condition – in combination with the likelihood that a defendant may contract COVID-19 while incarcerated and suffer severe symptoms as a result – may constitute a "serious" medical condition "from which [the defendant] is not expected to recover," which "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility."  U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I).  Such a definition, though not binding here, can help inform the Court's exercise of discretion in evaluating Defendant's motion.

**B.   Defendant has not presented extraordinary and compelling reasons warranting his release**

**1.   The family circumstances cited by Defendant do not constitute an extraordinary and compelling reason**

In his original motion for reduction in sentence, Defendant argued that his wife and his mother needed him.  He explained that his mother had undergone surgery and had later developed chronic obstructive pulmonary disease (or COPD).  Defendant further explained that his sister was unable to care for his mother and that the "sole caregiver" for his mother was his wife, but that his wife had

---

[4] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

contracted COVID-19, so her ability to provide care was "diminished." Dkt. 2244, at pp. 5 & 6 of 9.

In its October 2, 2020, Order denying Defendant's motion for reduction of sentence, this Court held that there was no evidence that Defendant's wife "is incapacitated and needs his care." Dkt. 2247, at 3:13-15. Rather, the Court noted, Defendant's "motion is about needing to care for his mother, and care for an ailing parent is not one of the family circumstances recognized by the Sentencing Commission." *Id.* at 3: 15-17 (citing U.S.S.G. § 1B1.13 cmt. n.1(C)).

Defendant has not explicitly asked this Court to revisit its prior ruling regarding his alleged family circumstances. But if the Court does reconsider its prior ruling, it should reach the same result as before. Many inmates could argue, as Defendant does in his motion, that they have a parent who is aging and ailing and to whom they could and would provide care if released from custody. Even accepting Defendant's contention that his sister is unable to care for his mother, there is no evidence that Defendant's wife is unable to do so. In his original motion, Defendant argued that his wife had contracted COVID-19. In denying his motion, this Court noted that she had contracted the disease in March 2020, more than a year ago. Dkt. 2247, at 3:13-15. Accordingly, it appears that Defendant's wife remains as an active caregiver for his mother. Thus, although Defendant's desire to care for his mother is understandable and laudable, that desire does not constitute an "extraordinary and compelling reason" warranting his immediate release. Several courts have reached the same conclusion in similar circumstances. *See United States v. Baye*, 464 F. Supp. 3d 1178, 1190 (D. Nev. 2020) ("While the Court sympathizes with Defendant regarding his mother's deteriorating condition, it also agrees with other courts in concluding that such a circumstance is not extraordinary because '[m]any, if not all inmates, have aging and sick parents.'") (quoting *United States v. Ingram*, 2019 WL 3162305, at *2 (S.D. Ohio July 16, 2019)); *United States v. Goldberg*, 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) ("While certainly admirable, a desire to help care for one's elderly parents does not qualify as an 'extraordinary and compelling reason' for release under U.S.S.G. § 1B1.13, nor, therefore, under 18 U.S.C. § 3582(c)(1)(A)(i)."); *cf. United States v. Shields*, No. 12-CR-00410-BLF-1, 2019 WL 2359231, at *5 (N.D. Cal. June 4, 2019) (denying claim for release to care for daughter with epilepsy where defendant's partner worked full-time, in part because "if this Court were to conclude that [the daughter's] circumstances warrant a reduction in [the defendant's] term of imprisonment, the same could be said of

*any* inmate who has young children and a spouse who must work" (emphasis in original)).  *But see*

*United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (finding that defendant's need to care for

his ailing mother was an extraordinary and compelling reason to reduce his sentence).

### 2.     Any COVID-19 threats to Defendant's health do not constitute an extraordinary and compelling reason

The risk of Defendant contracting COVID-19 was not a central portion of either Defendant's

original motion or his motion for reconsideration.  Indeed, the only argument that Defendant made in

this regard was to state that "the way that the pandemic is spreading here in this prison" means that

Defendant "is in dire need to be released."  Dkt. 2244, at p. 6 of 9.  To the extent that this Court wishes

to consider the threat of COVID-19 to Defendant personally in ruling on his motion for reconsideration,

the government sets forth additional facts here.

Based on materials provided by the BOP, the government has learned that Defendant has been

fully vaccinated for COVID-19.  He received his first dose of the Pfizer-BioNTech COVID-19 vaccine

on December 30, 2020; he got his second dose and became fully vaccinated on January 21, 2021.  *See*

Ex. 1, at 17 (under seal).  That development provides another basis for denial of Defendant's motion.

An inmate who has been vaccinated is no longer presenting an "extraordinary and compelling" reason

for release merely by pointing to the existence of COVID-19.  Indeed, although only informative rather

than binding, the Guidelines policy statement provides for consideration of compassionate release where

the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes

the ability of the defendant to provide self-care within the environment of a correctional facility and

from which he or she is not expected to recover."  U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).  The government

acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of

an adverse outcome from COVID-19 presents such a condition, because due to his or her condition the

defendant may be less able to protect himself against an unfavorable outcome from the disease.

That circumstance does not exist here.  According to the CDC, "the Pfizer-BioNTech vaccine

was 95% effective at preventing laboratory-confirmed COVID-19 illness."[5]  The FDA has granted

_____

[5] *See* Centers for Disease Control, *Information about the Pfizer-BioNTech COVID-19 Vaccine*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-

Emergency Use Authorization for distribution of this vaccine after reviewing the results of extensive testing showing the vaccine proved almost 95% effective in preventing infection, and virtually entirely effective in preventing severe disease – including for participants with medical comorbidities associated with high risk of severe illness upon contracting COVID-19.  *See* FDA Decision Memorandum, *available at* https://www.fda.gov/media/144416/download (Dec. 11, 2020) (Pfizer-BioNTech); *see also* Press Release, *Pfizer and BioNTech Confirm High Efficacy and No Serious Safety Concerns Through Up to Six Months Following Second Dose in Updated Topline Analysis of Landmark COVID-19 Vaccine Study*, *available at* https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-confirm-high-efficacy-and-no-serious (Apr. 1, 2021) ("The vaccine was 100% effective against severe disease as defined by the U.S. Centers for Disease Control and Prevention (CDC), and 95.3% effective against severe COVID-19 as defined by the U.S. Food and Drug Administration (FDA).").

Thus, Defendant has exercised "self-care" against the virus by becoming vaccinated, and no longer arguably presents any extraordinary and compelling reason allowing compassionate release on this basis.  *See*, *e.g.*, *United States v. Wallace*, No. 17-CR-00260-BLF, dkt. 58 (N.D. Cal. Mar. 9, 2021) (noting that defendant had both contracted and recovered from COVID-19 and had been vaccinated against the virus); *United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) ("[A]bsent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A).") (Moderna vaccine); *United States v. Beltran*, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (relief is denied in light of administration of first dose of the Pfizer-BioNTech vaccine).

Furthermore, BOP has taken significant measures to protect the health of inmates in its charge.  BOP has had a Pandemic Influenza Plan in place since 2012.  BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.  That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas."  *Id*. at i.  The plan addresses social distancing, hygienic and

BioNTech.html (last updated Apr. 16, 2021).

cleaning protocols, and the quarantining and treatment of symptomatic inmates.

BOP's COVID-19 "action plan" is described in detail at www.bop.gov/coronavirus/.  As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.  *See* BOP Modified Operations, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp.

All newly admitted inmates to any BOP detention center, jail, and institution are tested at a quarantine site for COVID-19, in addition to screening them for COVID-19 symptoms and a temperature check, before they enter their designated BOP facility.[6]  The testing is conducted either using Abbott instruments on-site or through commercial lab contracts.  Inmates who test positive or have symptoms consistent with COVID-19 are placed in isolation, even if asymptomatic, until they meet the current CDC release-from-isolation criteria.  COVID-19 negative inmates are placed in quarantine for 14 days and have twice-daily symptom screening and temperature checks.  If they develop COVID-19 symptoms during the 14 days, they are retested for COVID-19 and placed in isolation.  At the end of the 14-day quarantine, an inmate will be retested for COVID-19.  If the test is negative, the inmate will be deemed appropriate to transfer from the quarantine site to their designated institution.  Both inmates and staff are required to wear face masks during any transfer that occurs.

Importantly, according to data published by the BOP at https://www.bop.gov/coronavirus/, as of April 30, 2021, 788 inmates and 214 staff members at Lompoc have received full inoculations.  Every inmate will have had access to a vaccine by mid-May.[7]  Because of BOP's efforts to contain the virus and because of the inoculations that have occurred, BOP facility COVID-19 rates are falling rapidly.

---

[6] *See* Federal Bureau of Prisons, BOP Announces Update on Inmate Movement, *available at* https://www.bop.gov/resources/news/pdfs/20200527_press_release_inmate_movement.pdf; *see also* https://www.bop.gov/coronavirus/covid19_status.jsp.

[7] *See* Statement of Michael D. Caravel, BOP Director (Apr. 15, 2021), *available at* https://www.judiciary.senate.gov/imo/media/doc/BOP%20Director%20-%20%20Written%20Statement%202021-04-15%20SJC%20Hearing%20.pdf.

USA'S OPP. TO MTN. FOR RECONSIDERATION RE: ORDER
DENYING MTN. FOR SENT. REDUCTION [CR 14-0196 CRB]                    15

It is true that, in light of the pandemic, the BOP now has expanded authority to review inmates who are potentially vulnerable to COVID-19 earlier in their sentences for transfer to home confinement. The Attorney General has directed the BOP Director to prioritize granting home confinement to eligible inmates who are especially vulnerable to COVID-19 based on their age and underlying health conditions as identified by the CDC, where home confinement would be more effective in protecting their health, and if they do not present a great risk to public safety.  Att'y Gen. Memo. (Mar. 26, 2020), *available at* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.  The Attorney General has also invoked his emergency authority to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2)." Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, 134 Stat. 281, § 12003(b)(2) (Mar. 27, 2020).  As a result, BOP is broadly evaluating inmates for placement in home confinement according to internal guidelines, with priority given to those most vulnerable to COVID-19 and those at facilities most affected by COVID-19.  Att'y Gen. Memo. (April 3, 2020), *available at* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf; *see also* BOP Memo. (Apr. 13, 2021) (providing updated guidance allowing for consideration for home confinement of inmates with minor disciplinary issues within the past twelve months), *available at* https://www.fd.org/sites/default/files/news/2021.4.13_-_bop_home_confinement_cares_memo.pdf.  All that being said, Defendant is *not* eligible for home confinement based on his conviction, which relates to a criminal enterprise that involves, among other things, the illegal distribution of weapons.[8]

---

[8]  The government notes, and the Court is likely aware, that BOP has exclusive authority to determine the location where an inmate serves his or her custodial sentence, including whether transfer from a secure facility to home confinement under 18 U.S.C. § 3624(c) is more appropriate for a particular defendant.  *See United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (per curiam) ("The Bureau of Prisons has the statutory authority to choose the locations where prisoners serve their sentence."); *Reeb v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) ("Congress delegated to the BOP the duty to manage and regulate all federal penal and correctional institutions."); *see also Bonneau v. Salazar*, 804 F. App'x 717, 718 (9th Cir. 2020) (holding home confinement is a decision that is solely within the province of the BOP); *see also Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment programs].").  Although this Court may make a non-binding recommendation to BOP as to home confinement, BOP's designation decision "is not reviewable by any court."  18 U.S.C. §§ 3621(b) & 3624(c); *see, e.g.*, *United States v. Kim*, No. 17-CR-00355-YGR-1, dkt. 96 (N.D. Cal. May 1, 2020) (denying defendant's motion for compassionate release but recommending

1    Further details and updates of BOP's modified operations are available to the public on the BOP

2    website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

### 3.    Defendant's alleged rehabilitation in prison and other Section 3553(a) factors do not constitute an extraordinary and compelling reason

5    In his original motion, Defendant argued that his conduct while incarcerated had been

6    "exemplary" and that, therefore, his release from custody would be consistent with 18 U.S.C. § 3553(a).

7    Dkt. 2244, at p. 8 of 9.  Defendant also argued that his "rehabilitation progress and favorable behavior"

8    show that continued imprisonment neither would serve the interests of deterrence nor would be

9    necessary to protect the public.  *Id.*  Furthermore, Defendant argued that "men like him in their fifties

10   with limited criminal records are unlikely to recidivate."  *Id.*  Similarly, in his motion for

11   reconsideration, Defendant argues that a sentence reduction is warranted based on his "history and

12   characteristics, the need for [an] effective and supportive [environ]ment, and the accomplishment of the

13   deterrence and public safety factors purpose[s] of sentencing."  Dkt. 2266, at 3:12-17.  According to

14   Defendant, the time he has already served "has met many of the original sentencing goals."  *Id.* at 3:16-

15   17.  In essence, then, Defendant is arguing that the Court should take as a given that he has been

16   rehabilitated and that the Court should therefore re-balance the Section 3553(a) and conclude that a

17   lower sentence is now warranted.  The government disagrees.

18   As an initial matter, the government notes that, when it directed the Sentencing Commission to

19   promulgate policy statements regarding the sentencing modification provisions in 18 U.S.C.

20   § 3582(c)(1)(A), Congress expressly stated that "[r]ehabilitation of the defendant alone shall not be

21   considered an extraordinary and compelling reason" for a sentence reduction.  28 U.S.C. § 994(t).

22   Accordingly, the Court may consider Defendant's alleged "rehabilitation progress and favorable

23   behavior" while in prison only in conjunction with other factors.

24   Here, the Section 3553(a) factors – which this Court already considered when imposing

25   Defendant's sentence – do not support his request for premature, permanent release.  The law, and the

26   specific facts of defendant's case, neither demand nor endorse that result.  As the government stated in

27   _____

28   BOP place defendant in home confinement); *United States v. Jones*, No. CR 17-00070 VC, dkt. 93
(N.D. Cal. Apr. 10, 2020) (same); *United States v. Fobbs*, No. 19-CR-00410 WHA, dkt. 32 (N.D. Cal.
Apr. 7, 2020) (recommending BOP place defendant in home confinement).

USA'S OPP. TO MTN. FOR RECONSIDERATION RE: ORDER
DENYING MTN. FOR SENT. REDUCTION [CR 14-0196 CRB]                                    17

its sentencing memorandum in this case,

> [i]t is unlikely that the Court has previously had occasion to sentence a more prolific and diversified criminal defendant than defendant Keith Jackson. Defendant Jackson is a racketeer. Defendant Jackson has engaged in corruption of the political system through a wide variety of schemes to deprive the public of honest service and to utilize public officials to extort. Defendant Jackson has engaged in efforts to traffic firearms illegally into the United States. While engaging in that conduct, defendant Jackson also engaged in a variety of other related illegal activities such as narcotics trafficking, firearms trafficking, and a plot to commit murder-for-hire. Defendant Jackson also likely will stand out to the Court for corrupting his own son by introducing him to the defendant's criminal ventures.

Dkt. 1319, at 1-2 (USA's Sentencing Memorandum); *see also* PSR, ¶¶ 43-52 & 55-57 (describing weapons trafficking and weapons sales); PSR, ¶ 54 (describing drug trafficking); PSR, ¶¶ 58-63 (describing murder-for-hire). Defendant engaged in this conduct repeatedly and/or over the course of several years, such that it is important to refer to it as "criminal activities" (plural) rather than simply "criminal activity" (singular). Defendant's conduct also included extensive efforts to solicit and extort bribes on behalf of his co-defendant Yee and to act as Yee's "bag man," all of which served to subvert, pervert, and taint the political system. *See* dkt. 1319, at 2-4.

Indeed, in sentencing Defendant in 2016, this Court reflected on the breadth and scope of Defendant's criminal activities, noting that "I have to say that there are no limits that I have seen as to the breadth of the criminal activity. It is akin to being a one-person crime wave. You were willing to do anything assuming there was some compensation. And it didn't make a difference as to the nature of what you were asked to do." Dkt. 1467, at 25:7-12; *see also id.* at 1467:16-17 ("the scope of your criminal involvement is enormous").

On top of these criminal activities, Defendant also knowingly involved his own son in his crimes. As the government argued at sentencing, Defendant's "willingness to guide his own son into criminal activity should serve as an aggravating factor." Dkt. 1319, at 4:21-23; *see also id.* at 4:23-5:1 ("The very nature of bringing one's own child into a relationship such as this is clearly an act by the very criminally inclined.").

This Court also commented on the egregiousness of Defendant involving his son in his criminal activities. For example, the Court noted that "one other thing that is so disturbing . . . is the involvement of your child in this activity. . . . [W]hat's unusual about it is that it was malevolent. It was bringing

him into the criminal activity." Dkt. 1467, at 25:18-23; *see also id.* at 25:24-26:2 ("I recall one conversation with the undercover officer in which he said, should your son be involved in this?  And your response was, words to the effect, well, he's old enough to make his own decisions.").

In addition to punishing Defendant for his crimes, the Court's 108-month sentence served – and continues to serve – as a general deterrent to others.  As the Court is aware, the government continues to investigate and prosecute public corruption and related crimes in this District.  Reducing Defendant's sentence now – when all he has done is to behave well in prison – would send the wrong deterrent message to others who might consider engaging in similar conduct.  It would also send the message to the public that the egregious conduct in which Defendant engaged was not so egregious, after all.

The Court should also question the extent of Defendant's "rehabilitation."  As the government pointed out in its sentencing memorandum in 2016, Defendant sought then to minimize his conduct.  *See* dkt. 1319, at 5-9.  Now, five years later, the government is hard pressed to find anything in Defendant's pleadings that expresses remorse for his crimes.  Nowhere in Defendant's pleadings can one find a reflection of any soul-searching that Defendant has accomplished in the last five years, an expression of how he intends to make amends, and any enunciation of how he plans to contribute to society in a legal way once he is released (other than to care for his mother).

Granting Defendant's motion under Section 3582(c)(1)(A) would undermine these Section 3553(a) factors, resulting in an effective sentence of less than 75 months (assuming application of good-time credits), which is far below the 120-month sentence recommended by the government and the Guidelines and 33 months lower than the 108-month sentence this Court imposed.

Releasing Defendant outright would not reflect an appropriate re-balancing of the Section 3553(a) factors, particularly given that the present conditions caused by the pandemic are likely impermanent (*e.g.*, three vaccines have been authorized for emergency use in the United States and are being produced and distributed, and more are on the way).[9]  As noted above, Defendant is fully vaccinated.  Furthermore, the vaccination of both employees and inmates in federal prisons is well underway.  *See* Bureau of Prisons, *Clinical Guidance: COVID-19 Vaccine Guidance*, *available at*

---

[9] *See* Centers for Disease Control, *Benefits of Getting a COVID-19 Vaccine*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html.

https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf (Jan. 4, 2021).

The bottom line is that the vaccine situation has changed dramatically; the balance of Section 3553(a) factors has not.  There simply is no legitimate basis for transforming an appropriate sentence of 108 months imposed five years ago into a time-served sentence today (which would be approximately equivalent to a sentence of less than 75 months with application of good-time credits).

**C.** **This Court should not modify Defendant's sentence because he presents a risk of harm to the public**

The Court may only reduce a sentence under Section 3582(c)(1)(A) if supported "after considering the factors set forth in section 3553(a)," which includes "the nature and circumstances of the offense, the defendant's "history and characteristics," and "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and "to protect the public from further crimes of the defendant[.]"  18 U.S.C. § 3553(a)(1)–(2).

As discussed above, Defendant argues that "[e]xtraordinary and compelling reasons warrant a sentence reduction" because of his "history and characteristics, the need for [an] effective and supportive [environ]ment, and the accomplishment of the deterrence and public safety factors purpose[s] of sentencing."  Dkt. 2266, at 3:12-16.  He argues that the time that he has already served has met many of the goals of sentencing, and that, therefore, the Court should reduce his sentence to "time served" and place him on supervised release.  *Id.* at 3:16-21.  Defendant's argument is that given his age and good conduct in prison, this Court should conclude he no longer presents a danger.

But many defendants do well in prison only to revert to crime upon release, and many defendants have years of good conduct in prison but may remain dangerous to the public given the potential for further criminal conduct, a proper consideration under Section 3553(a).  The standard for compassionate release is not just whether someone has performed well in prison.  *See* 28 U.S.C. § 994(t) (rehabilitation of defendant is not, by itself, an extraordinary and compelling reason for reduction in sentence).  Defendant must also show that the Section 3553(a) factors, including the need to protect the public, weigh in favor of sentence modification.  Courts have balanced similar concerns with a defendant's risks from COVID-19.  *See United Sates v. Cazares*, 445 F. Supp. 3d 425, 435 (N.D. Cal. Apr. 23, 2020) (concluding, in the pre-trial detention context, that "the balancing of the factors does not warrant

[defendant's] release [because he] continues to pose a serious risk to the safety of the community, and that risk overrides [defendant's] concerns that he might contract COVID-19 at [local jail].").

The risk to the public posed by firearms and drug offenses has been well-established. *See United States v. Daychild*, 357 F.3d 1082, 1100 (9th Cir. 2004) (approving detention on danger prong due to defendant's possession of firearms and stating that "danger posed to the public by armed conspirators who traffic in illicit drugs is too plain to permit dispute."); *see also United States v. Torres*, 911 F.3d 1253, 1264 (9th Cir. 2019) (Congress passed Section 922(g) to "disarm groups whose members Congress believes are unable or unwilling to conduct themselves in conformity with the responsibilities of citizenship" (internal quotation marks omitted)).

Defendant's case involved weapons and narcotics trafficking, as well as murder-for-hire. *See* PSR, ¶¶ 43-52 & 55-57 (describing weapons trafficking and weapons sales); PSR, ¶ 54 (describing drug trafficking); PSR, ¶¶ 58-63 (describing murder-for-hire). Based on the facts before it, the Court should conclude that Defendant remains a significant risk to the public from future criminal activity and should not be released.

## CONCLUSION

Defendant did not exhaust all administrative rights before the BOP, and is a danger to others. In addition, neither Defendant's family circumstances nor the threat of COVID-19 justify a reduction in his sentence and a release from custody. Moreover, he has not presented any other extraordinary or compelling reason, or combination of reasons, to warrant a reduced sentence. Additionally, re-balancing the Section 3553(a) factors does not warrant the reduction Defendant seeks. This Court should therefore deny Defendant's motion for immediate release under 18 U.S.C. § 3582(c)(1)(A)(i).

DATED:  May 4, 2021                                     Respectfully submitted,

                                                        STEPHANIE M. HINDS
                                                        Acting United States Attorney

                                                            /s/
                                                        _____
                                                        KYLE F. WALDINGER
                                                        Assistant United States Attorney

CERTIFICATE OF SERVICE

I, KATHY TAT declare:

That I am a citizen of the United States of America and employed in San Francisco County, California; that my business address is Office of United States Attorney, 450 Golden Gate Avenue, Box 36055, San Francisco, California 94102; that I am over the age of eighteen years, and am not a party to the above-entitled action.

I am employed by the United States Attorney for the Northern District of California and discretion to be competent to serve papers. The undersigned further certifies that I caused a copy of the following:

**1.**   **UNITED STATES' OPPOSITION TO DEFENDANT KEITH JACKSON'S MOTION FOR RECONSIDERATION RE: COURT'S ORDER DENYING MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. 3582(c)(1)(A)(i);**
**2.**   **DECLARATION OF KYLE F. WALDINGER IN SUPPORT OF UNITED STATES' OPPOSITION TO DEFENDANT KEITH JACKSON'S MOTION FOR RECONSIDERATION RE: COURT'S ORDER DENYING MOTION TO REDUCE SENTENCE;**
**3.**   **EXHIBIT ONE**

to be served this date upon the party(ies) in this action by placing a true copy thereof in a sealed envelope, and served as follows:

_X___ FIRST CLASS MAIL by placing such envelope(s) with postage thereon fully prepaid in the designated area for outgoing U.S. mail in accordance with this office's practice.

____ PERSONAL SERVICE (BY MESSENGER/HAND DELIVERED)

_____ SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)

to the parties addressed as follows:

KEITH JACKSON
Lompoc Federal Correction Institution
Register number 19614-111
3600 Guard Rd
Lompoc, CA 93436

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on 5/4/2021 at San Francisco, California.

_____/S/_____
KATHY TAT
Legal Assistant

USA'S OPP. TO MTN. FOR RECONSIDERATION RE: ORDER
DENYING MTN. FOR SENT. REDUCTION [CR 14-0196 CRB]                                    22